(10 Misc. Rep. 503.)

### TRUSTEES OF AMHERST COLLEGE et al. v. RITCH et al.

(Supreme Court, Special Term, New York County.   December 28, 1894.)

TRUSTEES EX MALEFICIO—PROMISE BY LEGATEE.

Where a testator made a memorandum reciting that the residuary bequest was made in order that the residuary legatees might apply the property bequeathed to certain purposes, the persons intended to be benefited may compel the residuary legatees, as trustees ex maleficio, to carry out testator's intent.

Action by the trustees of Amherst College and others against Thomas G. Ritch and others to procure an adjudication that all of the residuary estate left by Daniel B. Fayerweather, and devised and bequeathed to defendants Thomas G. Ritch, Justus L. Bulkley, and Henry B. Vaughan, was received and is held by them in trust for plaintiffs and the several other institutions named in the ninth paragraph of the will of said Fayerweather, for the purpose of carrying out the intentions of the said Fayerweather as expressed in the tenth paragraph of said will, except as modified by the private memoranda hereinbefore set forth.   Defendants, the next of kin of said Fayerweather, and the personal representatives of his wife, are parties defendant, and ask that a release executed by them be set aside, and that the residuary estate be given to them.   Judgment for plaintiffs.

Putney & Bishop (Elihu Root, of counsel), for plaintiffs.

Arnoux, Ritch & Woodford (Thos. G. Ritch, of counsel), for defendants.

TRUAX, J.   On the 6th of October, 1884, Daniel B. Fayerweather made his last will and testament.   After making various provisions for relatives, friends, and certain charitable institutions, he, in the ninth clause of his will, bequeathed $2,100,000, in varying amounts, to plaintiffs and the 15 other institutions of learning mentioned in that clause, and gave to his executors power and authority, in their discretion, to withhold or reduce the amounts given to any of said institutions in case the conditions and circumstances of any of said institutions should be so changed as to render it inexpedient to pay all or any portion of said legacies to such institution.   The rest, residue, and remainder of his estate, both real and personal, he gave devised, and bequeathed, by the tenth clause of his will, to his executors, in trust, to convert the same into cash, and to divide the same equally among the institutions mentioned in the ninth clause of his will, share and share alike.   He nominated and apppointed the defendants Ritch and Bulkley executors of his will and trustees of his said estate.   The will was drawn by the defendant Ritch, who was a lawyer. .At the time Mr. Fayerweather executed said will, he gave to the defendant Ritch the following paper:

"New York, October 6, 1884.

"This certifies that I have executed my will of this date, having been advised by my counsel of the provisions and restrictions of the law of this state relative to benevolent corporations.   I trust my heirs will permit the provisions of this my will to be carried into effect.        D. B. Fayerweather."

On the 13th day of December, 1884, Mr. Fayerweather executed a codicil to his said last will and testament, by which he revoked the tenth clause thereof, and by which he gave, devised, and bequeathed all the rest and residue of his estate to said Bulkley and Ritch, "to them and their heirs, forever." At the time he executed the said codicil, he gave to the said Ritch an envelope addressed, "Mess. J. L. Bulkley and T. G. Ritch. To be opened in case of my death," which envelope contained a paper in his own handwriting, of which the following is a copy:

"New York, December the 11, 1884.
"Private Memorandum.

"I have made Messrs. Bulkley and Ritch my residuary legatees, in the confidence that thereby my intentions as expressed in my will shall be carried into effect, and without litigations on the part of any person or persons interested. In the case of my death, I trust that they will take such steps, by will or otherwise, as will protect my estate against the contingency of the death of either before my estate is settled and distributed.        D. B. Fayerweather."

Both the codicil and memorandum were prepared by or under the direction of Mr. Ritch after consultation with Mr. Fayerweather. On the said 13th day of December, both of them were handed to Mr. Ritch for safe-keeping. On the 7th of January, 1888, Mr. Fayerweather made a second codicil to his will, by which he made certain bequests, and then nominated and appointed the defendant Vaughan as an executor of his will and trustee of his estate, in addition to said Bulkley and Ritch, with the same powers and authority in every respect that were conferred on said Bulkley and Ritch, and also ratified and confirmed his said will and the first codicil thereto, except as therein modified. The codicil was also prepared by or under the direction of Mr. Ritch. On or about the 22d day of March, 1889, Mr. Fayerweather executed another codicil, dated March 19, 1889; but this codicil made, as far as this case is concerned, no material change in the will or the other codicils. Mr. Ritch had a number of interviews with Mr. Fayerweather shortly prior to the execution of this codicil. At these interviews, Mr. Ritch produced the memorandum of December 11, 1884, and the envelope in which it was contained. At the time of the execution of this codicil, Mr. Fayerweather made the following memorandum:

"Private Memorandum.

"Having made inquiries with regard to Hampton and Lincoln Universities, it is my judgment that the bequest to them should be withheld. I think the bequest to Cornell University should not exceed $100,000. If the Northwestern University at Evanston, Illinois, is in a prosperous condition, I would recommend that $100,000 be given to it. If the following persons are in my employ at the time of my death, I suggest that they receive the following sums: Rogers and Clark, $500 each; Gould, Campbell, and Stone, $300 each; and Carpenter, $250; also James, who now opens and closes the store, $100; John Dickson, $200. I also wish that $1,000 be given Miss Joyce immediately after my decease, in addition to the provisions made for her by my will.
"Mch. 22, 1889.                                D. B. Fayerweather."

This memorandum was also given to Mr. Ritch for safe-keeping. On the 3d of November, 1890, Mr. Fayerweather wrote to Mr. Ritch, requesting the latter to bring him the balance of the copy of his will; and, on or about the 7th of November, Mr. Ritch gave Mr. Fayer-

weather copies of the second and third codicils. On the 10th of November, 1890, Mr. Vaughan had an interview with Mr. Fayer-weather. At that interview Mr. Fayerweather produced a copy of the will and of the codicil thereto, and Mr. Vaughan, at Mr. Fayer-weather's request, read these papers aloud to him, and there was a discussion between them about the effect of the residuary devise con-tained in the codicils. Mr. Vaughan was ignorant of the three private memoranda hereinbefore referred to, but knew that Mr. Fayerweather wanted his property to go to certain institutions. As a result of the conversation between Mr. Fayerweather and Mr. Vaughan, Mr. Vaughan went to his own lawyer, who drafted another codicil to Mr. Fayerweather's will. This draft was taken by Mr. Vaughan to Mr. Fayerweather, who read and approved of it. On the 11th of November this codicil was executed by Mr. Fayerweather, and was put into the hands of Mr. Vaughan. It was, however, after-wards destroyed, at the request of Mr. Fayerweather. It revoked the devise of the residuary estate to Messrs. Bulkley and Ritch, and restored the tenth paragraph of the will. On the 13th of November, 1890, Mr. Vaughan had another interview with Mr. Fayerweather. At this interview two letters were prepared and signed by Mr. Fayer-weather, and given to Mr. Vaughan to deliver to Mr. Ritch. In one of the letters Mr. Fayerweather asked Mr. Ritch to deliver to Mr. Vaughan his original will and the first, second, and third codicils thereto. This letter was delivered on the same day by Mr. Vaughan to Mr. Ritch. and Mr. Ritch gave to Mr. Vaughan the original will and the first, second, and third codicils. The other letter is as fol-lows:

"11 East 57th Street, N. Y. City, November 13, 1890.

"Mr. Thomas G. Ritch—Sir: I have examined my original will, and the first, second, and third codicils thereto, handed by you to Mr. Vaughan at my request. By the tenth article of my will, I left my residuary estate to my executors in trust, to be equally divided among certain corporations and institutions. By the first codicil it seems that I revoked this tenth article of my will, and then made the following disposition of my residuary estate: 'All the rest and resi-due of my estate, of whatsoever character and wheresoever situated the same may be, of which I shall die possessed and remaining after the provisions of the first nine paragraphs of my will have been fully complied with and carried into effect, I give, devise, and bequeath to Justus L. Bulkley and Thomas G. Ritch, named in the eleventh paragraph of my said will, to them and their heirs, forever.' Please advise me at once in writing what is the effect of this clause, and to whom and how would my residuary estate go in case of my death, sup-posing the first codicil to remain in force.

"Yours, truly,                    .                    D. B. Fayerweather."

In answer to this request. Mr. Ritch dictated to his typewriter, while Mr. Vaughan was present, an answer, which he read to Vaughan. This answer is as follows:

"18 Wall Street, New York, November 14, 1890.

"D. B. Fayerweather, Esq.—Dear Sir: The intention of the change in ques-tion was to enable Messrs. Bulkley and myself to carry out the intentions of the will as modified by the various private memoranda in my possession. Nei-ther Mr. Bulkley nor myself would have any moral right to treat any portion of your estate otherwise than as we know would conform to your wishes. I suggest that I call on you with these, and, if still approved by you, that they be left in a sealed package with Miss Joyce, or any one named by you. The

legal effect of the clause in question is to vest the title to the residuary estate in Messrs. Bulkley and myself; but, as I have said, neither Mr. Bulkley nor I would wish to derive any personal benefit under this codicil.

"Yours, truly,                                          Thomas G. Ritch."

Upon reading this letter, Mr. Vaughan asked what these private memoranda were; and thereupon Mr. Ritch had copies of the three memoranda prepared, and handed them to Mr. Vaughan, who took them away with the letter. On the same day Mr. Ritch wrote a letter to Miss Joyce, in which, among other things, he said he would like to have Miss Joyce say to Mr. Fayerweather that he (Mr. Ritch) would execute any paper or say anything in her presence, or in that of any one else, that would enable him to feel that his wishes would be carried out to the letter, and that the will and codicils provide carefully for the institutions in which he was interested, and for the relatives and friends to whom he was attached. This letter was read by Miss Joyce to Mr. Fayerweather on the evening of that day, and was on the next morning handed to Mr. Vaughan, who then read it. On the 15th of November, Mr. Vaughan again saw Mr. Fayerweather, and conversed about making another codicil to Mr. Fayerweather's will. At this time Mr. Vaughan had present Mr. Ritch's letter of November 14th and the three said private memoranda. Certain immaterial changes were made on the memorandum of March 22, 1889, and certain other memoranda were made on the envelope containing the letter of Mr. Ritch to Miss Joyce, as follows:

"Clause about Miss Joyce, about the men with him. More institutions for benefit. Mrs. Beardsley, amount $100,000 in bonds. Strike out about servants in his employ."

As a result of the conversations between Mr. Fayerweather and Mr. Vaughan, Mr. Vaughan had an interview with Mr. Ritch at his office, and gave instructions to have another codicil to Mr. Fayerweather's will prepared. This was done, and Mr. Vaughan and two gentlemen connected with Mr. Ritch's firm returned to Mr. Fayerweather's house, and the following codicil was then and there executed:

"I, Daniel B. Fayerweather, of the city of New York, having made and executed my last will and testament, dated October 6, 1884, and codicils thereto, dated December 13, 1884, January 7, 1888, and March 19, 1889, do hereby make, publish, and declare this fourth codicil to and as a part of my said last will: First. In all respects, except as hereinafter modified, I ratify and confirm my said will and the codicils thereto. Second. I hereby confirm the revocation of the tenth paragraph of my said will. Third. I hereby amend and change the third paragraph of the codicil dated and made December 13, 1884, so as to read as follows: 'All the rest and residue of my estate, of whatsoever character and wheresoever situated the same may be, of which I shall die possessed, and remaining after all the specific legacies in my said will and the several codicils thereto have been paid and all the provisions of said will and codicils have been fully complied with and carried into effect, I give, devise, and bequeath to Justus L. Bulkley, Thomas G. Ritch, and Henry B. Vaughan, to them and their heirs, forever."

Mr. Fayerweather died on the same day, leaving his widow and three nieces him surviving. On the 5th of December, 1890, proceedings to probate the will of Mr. Fayerweather were commenced.

Waivers of citation and consent to the probate of the will and codicils were executed by the widow and the next of kin. The waiver and consent were subsequently withdrawn, and on the 15th of December, 1890, objections to the probate of the will and codicils were filed by the widow, and on the 21st of December, 1891, objections to the probate of the fourth codicil were filed by the next of kin. The objections were to the effect that the will and codicils were not executed as required by law; that the testator was not of sound and disposing mind and memory; and that the will and codicils were procured by undue influence and fraud. The will was admitted to probate on the 25th of February, 1891. On the 5th of March, 1891, a settlement was agreed upon between the executors, the widow, and the next of kin, by which all objections to the probate of the will and four codicils were withdrawn, and by which they consented to the probate of the same. Said widow and next of kin also agreed not to bring any suit for the construction of the said will and codicils, or to set aside the will and codicils, or either of them, and not to make any claim upon the said Bulkley, Ritch, and Vaughan, or either of them, or against their heirs or personal representatives, or against the said Bulkley, Ritch, and Vaughan, as executors or as residuary legatees, other than for the amounts left to the said widow and next of kin by the will and codicil aforesaid, and by a certain instrument dated the 5th day of May, 1891. And they further agreed that upon the payment to them, respectively, of the several amounts mentioned in said last-mentioned instrument, they would severally execute a general release of all claims except those arising under the will and codicil, both to the executors and to the donees mentioned in the said instrument of March 5, 1891, and to the said Bulkley, Ritch, and Vaughan individually. At the same time all of the plaintiffs, except the University of Rochester, and all of the other colleges and institutions mentioned in the ninth paragraph of Mr. Fayerweather's will, executed a paper, wherein it was recited that a contest had been proceeding in the court of the surrogate of the county of New York against the probate of the last will and testament and four codicils thereto propounded by the executors of Daniel B. Fayerweather, deceased, and certain other proceedings had been threatened concerning the construction and validity of the will; that the undersigned are legatees named in said will, and it is to their interest to have the said controversy settled and the threatened controversy abandoned; that a settlement of all the controversies had been previously agreed to, whereby the widow and next of kin have agreed to accept the sum of $310,000, and in consideration thereof to consent to the probate of the will and codicils as propounded, and to release the estate of said Fayerweather from all claims except those to which the said widow and next of kin are respectively entitled by the provisions of the will and codicils aforesaid; "and that in consideration of the foregoing, and to enable the provisions of the said settlement to be carried out, it is agreed by the undersigned that the said sum of $310,000, and all expenses connected with the said litigation, be paid by the ex-

ecutors of the last will and testament of Daniel B. Fayerweather, deceased, prior to and in preference to the payment to the undersigned, respectivly, of the amount of the legacies in the will mentioned; and that each for ourselves agree that our respective legacies shall be postponed to the payment of the amount above mentioned and all the expenses above mentioned." The codicils were admitted to probate by the consent of the widow and next of kin, and a final decree was entered on March 24, 1891. Thereafter the widow and next of kin executed and delivered the releases they had agreed to deliver, as hereinbefore stated. On the 24th of February, 1894, the said Ritch, Bulkley, and Vaughan executed an instrument, known as the "deed of gift," by which they make specific gifts of various sums of money to individuals, to 10 hospitals, and to 21 colleges, among which are 7 of the institutions named by Mr. Fayerweather, and by which any surplus of the residuary estate is directed to be divided into 10 equal parts, and to be divided in certain proportions among certain of the defendants. The various persons, institutions, and colleges named in this instrument have been made parties to this action.

This action is brought by the plaintiffs for the purpose of having it decreed that all of the residuary estate left by the said Daniel B. Fayerweather, and devised and bequeathed to the defendants Thomas G. Ritch, Justus L. Bulkley, and Henry B. Vaughan, was received and is held by them in trust for the plaintiffs and the several other institutions named in the ninth paragraph of the will of said Fayerweather, for the purpose of carrying out the intentions of the said Fayerweather as expressed in the tenth paragraph of said will, except as modified by the private memoranda hereinbefore set forth. Mrs. Fayerweather is dead; but her personal representatives are parties defendant to this action, as are also the next of kin of Mr. Fayerweather. They ask that the release executed by them be set aside, and that the residuary estate above referred to be given to them. The donees in the deed of gift are also parties to the action, and ask that the provisions of the deed of trust be carried out. I shall first determine whether the claim of the plaintiffs can be maintained.

The earliest reported case bearing upon the subject in question is Rookwood's Case, Cro. Eliz. 164. Rookwood had three sons. He intended to charge his lands with £4 per annum to each of his two youngest sons for their lives; but the eldest son desired him not to charge the land, and promised to pay to the two youngest sons the £4 per annum, to which the two youngest sons, being present, agreed. The older son did not pay after the death of the father, and the younger sons brought an assumpsit. The whole court held clearly that it was well brought, and that it was a good consideration, for otherwise the land had been charged with the rent.

In Dutton v. Pool, 1 Vent. 318, the plaintiff declared that his wife's father, being seised of certain lands now descended to the defendant, and being about to cut £1,000 worth of timber off from the lands to raise a portion for his daughter, the defendant promised to the

father, in consideration that he would forbear to sell the timber, that he would pay the daughter £1,000. Judgment of nonsuit was reversed by the full bench.

In Chamberlaine v. Chamberlaine, Freem. Ch. 34, a testator having settled lands upon his son for life, and, having discoursed about altering his will for fear there should not be enough beside to pay certain legacies to his daughters, was told by the son that he would pay them if the assets were deficient, but afterwards, pretending that the lands devised to him fell short of the legacies, filed his bill to have a sum alleged to be equal to the deficiency raised out of other parts of the estate; and it was decreed that, after suffering his father to die in peace on a promise which had prevented him from altering his will, he should pay them himself, and the lord chancellor said it was the constant course of his court to make such decrees upon promises made that the testator would not alter his will. This was in 1679.

Thynn v. Thynn, 1 Vern. 296, was as follows: A man made his will, and his wife executrix. The son afterwards prevailed on his mother to get the father to make a new will, and to name him executor, but promising to be a trustee only for his mother. A trust was decreed for the mother, notwithstanding the statute of frauds and perjuries. And to the same effect is Devenish v. Baines, Prec. Ch. 3.

In Olham v. Litchford (1705) Freem. Ch. 284, the case was that the testator was making his will, and, among other things, was directing a gift to the plaintiff to be inserted in this will; and the defendant, being present, desired him not to put it in his will, but said, as he was a Christian, he would take care to see it paid; and thereupon it was omitted in the will. But the lord keeper decreed that the defendant should pay it, and the ground he went upon was that this was a fraud upon the tastator and the (proposed) legatee.

A case is reported in 2 Eq. Cas. Abr. 46, as follows: The father purchased land for him and his heirs, and, when he was on his death-bed, sends for his eldest son, and tells him that these lands were bought with the second son's money, and that he intended to give them to him; whereupon the eldest son promised that he should enjoy them accordingly. The father dies. Lord Keeper Wright and the master of the rolls held that the eldest son ought to have these lands; because of the statute of frauds there ought to have been a declaration of the use or trust in writing. But Cowper, Ch., was of another opinion, because of the fraud in this case, in that the eldest son promised the father upon his deathbed that the other should enjoy the lands; so he took this to be a case out of the statute.

In Drakeford v. Wilks, 3 Atk. 539, it was held that if a legatee promises a testator that, in consideration of a disposition in her favor, she will do an act in favor of a third person, she who undertakes to do the act must perform.

The facts in Reech v. Kennegal, 1 Ves. Sr. 123, are as follows: J. Kennegal, having made his will, deposited it in the hands of one of his nephews, whom he made executor and residuary legatee, with the manifest intention of reconsidering it, which he afterwards does, in

the presence of the minister of the parish.     William, another nephew, being then there, mentions the testator's intention to leave him £100, which the testator allows, and desires his executor to pay, who undertakes it, but saying that there would be no occasion to alter the will for that purpose, for he would pay it, and give his bond or note if insisted upon.     But the testator is satisfied with that, and dies the next day.     It is argued that there was no element of fraud, nothing but a promise that chancery would not enforce.     Hardwicke, Ch., said:

"The question, then, is whether this is a case of fraud, strengthened by the promise of the defendant; and I am of opinion that it is.     It has been taken as if the fraud must be on the person who might have a remedy at law, but this court considers it as a fraud also upon the testator, for whom none can have remedy but a person coming here for payment.     There is a breach of promise, but attended also with fraud upon the testator, as well as the plaintiff, by representing as if there was no occasion to alter the will, and comes within the proper jurisdiction of this court as imposition."

In Barrow v. Greenough, 3 Ves. 152, the testator requested the executor and residuary legatee to make certain payments in excess of the amounts named in the will.     The residuary legatee promised to do as desired, but requested the testator to make a new will.     He refused to do so, saying that he would leave the same to the defendant's generosity.     The court said:

"The question is whether by reposing that trust in the defendant the testator was not prevented from making a new will.     The defendant had no intention of fraud, but he ought to have told the testator that, if he did not put it in his will, he would not do it.     Instead of that he promised to do it, upon which the testator refuses to make a new will, and says he leaves it to his generosity; that is, he leaves it to his conscience.     I shall make him perform."

In Crook v. Brooking, 2 Vern. 50, 106, Mallock bequeathed £1,500 to Simon and Joseph Snow, to be disposed of on such secret trust as he had privately revealed to Simon.     After Mallock's death, Simon, in a letter to Joseph, stated what the secret trust was.     It was held that the trust was well and sufficiently declared by the letter, and that both trustees were bound.

In Mestaer v. Gillespie, 11 Ves. 638, Lord Chancellor Eldon held that a devisee who prevents his testator from changing a legacy by undertaking to pay it is bound in equity, though not in law, to pay the legacy; and that, if a tenant in tail is prevented from completing a recovery by the fraud of a person whose wife is entitled in remainder, equity will treat the estate, even as against the wife, who was innocent of fraud, as if the recovery had been suffered.

In Chamberlain v. Agar, 2 Ves. & B., 259, relief was granted upon the ground of fraud in not performing a promise relying on which the testator forbore to bequeath.

In Smith v. Attersoll, 1 Russ. 266, the master of the rolls (Lord Gifford) held that where a testator bequeathes a legacy to A. and B. in trust for certain purposes, which the will says have been fully explained to them, and on the same day A. and B. sign a paper writing to the effect that the bequest is upon trust for six persons, whose names are stated, and after their signatures some lines are added in the handwriting of the testator, by which a seventh person (an unborn

child) is admitted to share in legacy, the paper writing was a valid declaration of trust.

In Podmore v. Gunning, 5 Sim. 485, it was alleged that Sir T. Staines, desiring to provide for two natural daughters, made a will leaving his residuary estate to his wife, "having a perfect confidence she would act up to those views which I have communicated to her in the ultimate disposal of my property after her decease." Previous to the execution of the will, the testator remarked to his wife, "My wish is that the Podmores [meaning the plaintiffs] shall have my property after your death, provided upon inquiry you find that they are respectable," to which she answered, "You may depend on me." The wife made a will, in which she provided for the natural daughters of her husband, and afterwards remarried. Upon her death her second husband took out letters of administration upon her estate, it appearing that the will had been destroyed by him. When the case was brought to trial, the plaintiffs failed. See 7 Sim. 644. The court said that, if the plaintiffs had proved their case, they would have been entitled to the relief which they asked; but that they had so completely failed in proving it that their bill must be dismissed.

In Tee v. Ferris, 2 Kay & J. 357, the testator devised real and personal property to F. and the plaintiff, as tenants in common, and by a memorandum of even date addressed to them, and signed by him, expressed his confidence that they would appropriate the property to charitable objects. This memorandum was read to F. on the day of testator's death, after which he executed another codicil. Held, that F., by silently listening to the reading of this memorandum, became chargeable with the trust. It was also held that the trust failed as to so much only as was invalid under the mortmain act; and that, the devisees being tenants in common, those who were not informed of the intention of the testator before his death took their distributive shares free from the trust.

In Attorney General v. Dillon, 13 Ir. Ch. 127, it was held, where the testator left all his estate to a legatee absolutely, and the legatee promised to apply it to charitable uses, that it was a valid trust.

In Norris v. Frazer (1873) L. R. 15 Eq. 318, the testator gave her residuary estate to trustees for the benefit of a married woman. The plaintiff filed a bill, alleging that the married woman and her husband both promised the testator at his request on his deathbed to make plaintiff an allowance of £300 a year. The wife testified that she assented, and the husband testified that he would not swear that he did not assent. Held, that a trust in plaintiff's favor was established.

In Sidgreaves v. Brewer, 15 Ch. Div. 594, the codicil gave all the testatrix's estate to a legatee, "to be applied as I have requested him to do." The testatrix, at the same time she executed the codicil, stated to the legatee the persons to whom and amounts for which she wished him to distribute the estate. This was held to create a valid trust in favor of the beneficiaries named.

In Boyes v. Carritt (1884) 26 Ch. Div. 531, it was held that the testator must impose a trust, and the legatee must accept, in order

that the trust may be enforced; but the acceptance may be implied from the legatee's silence.

It was held in Re King's Estate (1888) 21 Ir. Law R. 273, that if a testator, at or before the execution of his will, communicate to a person to whom he proposes to give a legacy that the legacy is given upon trust, to be applied in a particular way, and if the legatee expressly or tacitly consent to take the legacy on these terms, the court of chancery will not permit him to be guilty of a fraud, but will compel the execution of the trust so communicated; and that, if the bequest be to two or more legatees, a valid trust is created if the communication be made to any one of them before or at the time of the execution of the will.

In Bedilian v. Seaton, 3 Wall. Jr. 279, Fed. Cas. No. 1,218, one Seaton was about making a will leaving his property to his natural daughter, when one of his brothers said that he should make his mind easy, and give himself no trouble about that; that the daughter should have it all, every cent of it. No will was executed. The brothers refused to give the daughter the property. Judge Greer said, if the property had been devised to John and James, the brothers, under a parol agreement by them that they would hold it in trust for Harriett, the daughter, the case would be like that of Hoge v. Hoge, 1 Watts, 163, and numerous others, in which equity treats the fraudulent procurer of the legal title as a trustee ex maleficio.

It was said in Hoge v. Hoge, supra, that every part of a will must be in writing, and a naked parol declaration of trust in respect of lands devised is void. "The trust insisted on here, however, owes its validity not to the will or declaration of the testator, but to the fraud of the devisee. It belongs to a class in which the trust arises ex maleficio, and in which equity turns a fraudulent procurer of the legal title into a trustee to get at him, and there is nothing in reason or authority to forbid the raising of such a trust from the surreptitious procurement of a devise."

In Gaullaher v. Gaullaher, 5 Watts, 200, following Hoge v. Hoge, supra, it was held that a moral obligation is sufficient to sustain such a promise.

In Jones v. McKee, 3 Pa. St. 496, Church v. Ruland, 64 Pa. St. 432, and Headley v. Renner, 129 Pa. St. 542, 18 Atl. 549, it was held, in substance, that, if one promise a testator that he will give a legacy to a third person, such promise creates a valid trust which will be enforced.

In Schultz's Appeal, 80 Pa. St. 396, a testator wished to leave his estate to charitable uses. The Pennsylvania statute provides:

"That no estate, real or personal, shall hereafter be bequeathed, devised or conveyed to any body politic or to any person in trust for religious or char-. itable uses, except the same be done by deed or will attested by two credible and at the time disinterested witnesses at least one calendar month before the death of the testator or alienor, and all dispositions of property contrary hereto shall be void and go to the residuary legatee or devisee, next of kin or heirs, according to law."

The testator was advised that bequests of charity would be void if he should die within 30 days, but that he might make an absolute be-

quest of his property to a person in whom he trusted, and he might be informed of his wishes.    The testator made a bequest to one Yeakle. The bequest was held good as against the next of kin.    The devisee was not a party to the making of the will, and was not informed of the devise in his favor until after the death of the testator.    The court said (Sharswood, J.):

"It is urged that this whole plan is nothing but a contrivance to evade the statute.    No doubt, such was the intention of the testator.    It is said that it is a fraud upon the law, and that the bequest ought therefore be declared void.    But that overlooks the fact that the absolute property in the subject of this bequest has vested in the legatee, and that he is entirely innocent of any complicity in the fraud of the testator.    If the statute is practically repealed by this construction, it is evident that it must be for the legislature to devise and apply a remedy, not the judiciary, whose province is not jus dare, but jus dicere."

In Re Hoffner's Estate, 161 Pa. St. 331, 29 Atl. 33, A., owning property, said to B. he would will it to B. provided the latter would promise upon his death to will it to a certain church, designating the church. B. promised to do it.    A. thereupon willed the property to B. under that promise.    B. intended to carry it out and tried to do so.    He made a will willing it to the church, but he died in less than a month after the will was made; so that the will was void.    The court said that the intention of these parties was to give the property to the church; we will follow out their intention; and, although we have to say the will is void, a constructive trust has arisen in favor of the church, and we will compel the heir of this testator to convey according to that trust.

In Williams v. Vreeland, 32 N. J. Eq. 135, affirmed Id. 734, it was held that the ground upon which such a trust is set up is simply that of fraud practiced by the party on whom the trust is said to be fastened, and nothing short of this can ever be held sufficient. For the prevention of fraud, the trust is ingrafted on the gift by admitting parol testimony in order to prevent the donee from appropriating property to a purpose different from that for which he undertook to hold it.    It was held in this case, in order to maintain it, two facts must concur:    First, that the testator gave a legacy to the legatee in order that he might take it not wholly for his own benefit, but also as trustee for complainants; secondly, that the testator's mind and intention were made known before his death to the legatee, and the legacy was accepted by him on this footing. And to the same effect is Carver v. Todd, 48 N. J. Eq. 102, 21 Atl. 943.

In Olliffe v. Wells, 130 Mass. 221, Gray, C. J., said: ·

"Where a trust not declared in the will is established by a court of chancery against the devisee, it is by reason of the obligation resting upon the conscience of the devisee, and not as a valid testamentary disposition by the deceased.    When the bequest is outright upon its face, the setting up of a trust, while it diminishes the rights of the devisee, does not impair any right of the heirs or next of kin in any aspect of the case; for, if the trust were not set up, the whole property would go to the devisee by force of the devise.    If the trust set up is a lawful one, it ·inures to the benefit of the cestui que trust; and, if the trust set up is unlawful, the heirs or next of kin take by way of resulting trust."

In Gilpatrick v. Gliddon, 81 Me. 137, 16 Atl. 464, it was held that:

"When one obtains the legal title to real or personal estate, either by will or otherwise, under circumstances which render it unconscientious for him to retain it for his own benefit while in fact another is entitled to it, or to some interest in it, equity secures to the latter his right; not by disregarding the former's legal title, but by imposing on him the duty of holding and using his title for the real beneficiary. * * * Equity does not interfere with the will; that remains unchallenged. * * * We do not mean, however, that it is essential to the upholding of such a trust that a devisee should have been an active agent in procuring the devise to be made in his favor; for the great current of English authority during the last two centuries, as well as that of this country, holds that if, either before or after making the will, the testator makes known to the devisee his desire that the property shall be disposed of in a certain legal manner other than that mentioned in the will, and that he relies upon the devisee to carry it into effect, and the latter, by any words or acts calculated to, and which he knows do in fact, cause the testator to believe that the devisee fully assents thereto, and in consequence thereof the devise is made, but after the decease of the testator the devisee refuses to perform his agreement, equity will decree a trust, and convert the devisee into a trustee, whether when he gave his assent he intended to defraud or not, the final refusal having the effect of consummating the fraud."

In Dowd v. Tucker, 41 Conn. 197, the testatrix upon her deathbed desired to change her will, and give certain real estate to a niece, and had a codicil prepared for that purpose. By the will all the property was given to one Tucker, and, before signing the codicil, she wished to secure his consent to the change. After stating her purpose to him, he replied that she was weak, and need not trouble herself to sign a codicil, but that he would deed the property to the niece, and carry out her wishes. Trusting in his promise, she did not change her will. After her death, Tucker refused to convey to the niece. On a bill in equity brought to compel him to convey, it was held that he took the property under a trust for her, which a court of equity would enforce. To the same general effect is Buckingham v. Clark, 61 Conn. 204, 23 Atl. 1085.

In Gaither v. Gaither, 3 Md. Ch. 158, it was held that if an heir or personal representative or devisee, whose interest would be prejudiced by the insertion of a provision in a will in favor of some third person, induces the testator to omit such provision by assurances, either by words or silent assent, that his wishes shall be executed as if the provision were made, such assurance will raise a trust which will be enforced in equity on the ground of fraud.

In Ragsdale v. Ragsdale, 68 Miss. 92, 8 Atl. 315, it was held that where one has prepared a will naming his son as devisee of certain land, and afterwards, in his last illness, when proposing to give by codicil a half interest therein to another son, the devisee named actively interferes, and by assurances that he will convey to his brother the half interest, together with other conduct and representations, prevents the making of the codicil, he will, after the testator's death, be held a trustee of a half interest in the land for his brother; and that, while an oral promise to hold land in trust for another person is void, thus to interfere and prevent a testator from making a provision for another, whereby a bounty intended

for such other is intercepted, is a fraud from which a trust arises by operation of law, not within the statute of frauds or wills.

In Larmon v. Knight (Ill. Sup.) 29 N. E. 1116, 30 N. E. 318, where a married woman on her deathbed, on her husband's promise that he would redeem certain property in which she had an equity of redemption, and hold the property for the benefit of her children, conveyed the interest in the property to her husband, it was held that he became a trustee for the children, and that it was not necessary to show that he expressed any purpose not to perform his promise. The fact that he did not comply with his promise was presumptive evidence that he did not intend to do so when it was given.

In Barrell v. Hanrick, 42 Ala. 60, the testator bequeathed to Edward Hanrick his whole estate, and afterwards made a codicil making two specific legacies. Plaintiff, a resident of New Jersey, a brother of testator, brought suit against Hanrick's legal representatives, alleging that the will was executed during the war of the Confederacy; that, under the laws of the Confederate States, a citizen of New Jersey was regarded as an alien enemy; that the bequest was made to Hanrick for the use of plaintiff, that it might not be sequestrated. The court held that this was a valid trust of real property, not prohibited by statute.

In a case in Tennessee (McLellan v. McLean, 2 Head. 684) the testator made an absolute bequest of his property to his wife. It was shown that the will was made upon an agreement with the wife that the property should be divided upon her death equally between her relatives and his. She subsequently made a will leaving more of the property to her relatives than to his. It was held that the trust could be established by parol, and that, being so established, it would be enforced against the beneficiary under the wife's will. And in Richardson v. Adams, 10 Yeag. 273, a similar promise in reference to personal property was enforced.

In Bennett v. Harper, 36 W. Va. 546, 15 S. E. 143, the testator devised a farm of 600 acres to the complainant, one of his daughters, which farm he had previously given to the husband of another of his daughters by a voluntary deed, said husband having during the life of the testator been made aware of the contents of his will, and that, in order for it to be effective to bestow any benefit upon the plaintiff, it would be necessary for him to surrender the former voluntary donation, and that the will was made upon that condition. It was held that the said voluntary donee inter vivos having assented to such condition, or having lain by and acquiesced without objection or remonstrance, thereby securing to himself and wife the whole property designed by the testator to be divided between his two daughters, this conduct was such as to render him a trustee for the complainant to the extent of the interest she would have taken under her father's will.

In Towles v. Burton, Rich. Eq. Cas. 146, it was held that a trust may be established by parol in an absolute bequest by showing that the legatee received it upon a promise made to the testator to provide for a third person out of it.

In Hooker v. Axford, 33 Mich. 453, plaintiff's wife was the owner

of property which she wished to leave to her husband free from the claims of his creditors. She sent her husband to consult one of the defendants, an attorney, who advised that the wife devise the property to him and Axford on an oral understanding that he would hold it for plaintiff's benefit. The wife did so. Axford knew nothing of the arrangement. The plaintiff brought a bill to enforce the trust so arising. The attorney admitted the allegation, and expressed his willingness to convey. Axford claimed the legal title. It was held that the promise of the attorney raised a trust which would be enforced against Axford as well as against the person who made the promise. Cooley, C. J., said:

"The will then must be regarded as made as it was, because Crocker, who was an attorney at law, advised that it should be. If he had given the advice intending to appropriate the property, this would have been a gross fraud and a gross breach of confidence. It would be equally a fraud if, having given the advice honestly, he should afterwards conclude dishonestly to retain the lands, and, this being his position, the party who under his advice is associated with him is in the like position. It would be a fraud in Axford to appropriate that which only by the advice of Crocker, given for another person's benefit, is brought within his reach. The fraud on Mrs. Hooker's estate would be exactly the same whether one or the other of the nominal beneficiaries repudiates the trust."

In Spicer v. Spicer, 16 Abb. Pr. (N. S.) 112, the plaintiff sued the defendant to recover a sum claimed to be due under the following circumstances: Plaintiff married one John, a brother of defendant. She had a previous husband then living. John proposed to make a will in favor of the plaintiff. The defendant said he could propose a better plan, and that, if John would convey his interest in the property to him, he would pay plaintiff a sum equal to her dower. John dying, the defendant refused to complete his agreement. The court held that he must.

In Williams v. Fitch, 18 N. Y. 546, the father of the testatrix had in his hands a sum of money which he held as trustee for testatrix, which he agreed to hold as trustee for the nephew of the testatrix in consideration that she would not make a will leaving the property to her nephew. It was held that, after the death of the testatrix, the father held the funds in trust for the nephew.

In Moyer v. Moyer, 21 Hun, 67, a father conveyed land to his son upon his agreement to hold the land for the benefit of the grantor's widow and infant children. It was held that the grantee held as trustee.

The most important case on this point, however, is O'Hara v. Dudley, 95 N. Y. 403. The testatrix in that case gave the bulk of her estate to three persons, who were her lawyer, her doctor, and her priest. It was not intended by her to give to the persons named any beneficial interest, but her design was to devote the property to certain charitable purposes. This, she was advised by one of the legatees, could not be done by express provision in her will, but only by an absolute gift to individuals, to whose honor she could confide the execution of her purpose. She signed a letter of instructions contemporaneous with the will, addressed to the legatees and devisees, stating the reason for the gift, and dictating the pur-

pose to which it should be put. The will was executed in reliance upon a promise of the legatees to apply the fund faithfully and honorably to the uses specified by the testatrix. In an action to establish a trust it was held that the gift could not be sustained as an absolute one to the persons named as legatees, as this would be a fraud upon the testatrix; that the secret trust attempted to be created could not be enforced, nor would equity permit it to be carried out, as it was in violation of the statute against perpetuities; but equity would impose a trust upon the fund for the benefit of the heirs and next of kin. Judge Finch stated, in writing the opinion of the court in this case:

"Equity acts in such case, not because of a trust declared by the testator, but because of the fraud of the legatee. For him not to carry out the promise by which alone he procured the devise and bequest is to perpetrate a fraud upon the devisor which equity will not endure."

The doctrine of this case in this respect was affirmed in Re Keleman, 126 N. Y. 73, 26 N. E. 968.

There is a class of cases in which the courts have refused to enforce a trust created dehors the will, where the trust was created for the purpose of evading statutes like the mortmain statutes. The first statute relating to mortmain is contained in the second great charter of King Henry III. (chapter 43). The charter provided that:

"It shall not from henceforth be lawful for any to give his lands to any religious house and to take the same land again to hold of the same house; nor shall it be lawful to any house of religion to take lands of any and to lease the same to him from whom they were received. Therefore, if any from henceforth do give his land to any religious house and thereupon be convict, his gift shall be utterly void, and the land shall accrue to the lord of the fee."

This provision was continued in the third great charter of King Henry III. (chapter 36); and also in the first great charter of King Edward I., granted October 12, 1297, in the twenty-fifth year of his reign; in "Statute de Religiosis" (7 Edw. I. St. 2); Westm. II. (13 Edw. I. St. 1, c. 22); "Statute Quia Emptores" (18 Edw. I. c. 3); and the statute of amortizing lands (34 Edw. I. St. 3; 18 Edw. III. St. 3, c. 3; 15 Rich. II. c. 5; 23 Hen. VIII. c. 10, §§ 2–5; 7 and 8 Wm. III. c. 37, §§ 1, 2; and 9 Geo. II. c. 36), commonly known as the "Mortmain Act." See, also, 2 Bl. Comm. 268. Magna Charta and the statutes above referred to were little more than a restoration of the common law as it existed in the time of the Saxons, about 60 years before the reign of William I., at which period it was essential to procure a license from the king and the intermediate lord before estates could be alienated to any community by which rents and services should be entirely lost; and, if no such license were obtained, the king or other lord might enter upon the land so alienated in mortmain as a forfeiture. Thompson's Historical Essay on the Magna Charta, p. 260. The last statute (9 Geo. II. c. 36) provides that no lands or tenements or money to be laid out thereon shall be given for or charged with any charitable uses whatsoever, unless a deed indented, executed in the presence of two witnesses, twelve calendar months before the death of the donor, and enrolled in the court of chancery within six months after its execution (except stocks in the

public funds, which may be transferred within six months previous to the donor's death), and unless such gift be made to take effect immediately, and be without power of revocation, and that all other gifts shall be void.

This statute was before the court in Boson v. Statham, 1 Eden, 508, upon the following state of facts: There was a devise by will, attested by three witnesses, to A., B., and C., and the heirs of the survivor. The bill stated that it was upon a secret trust for a charity, declared by an instrument executed at the same time as the will, and attested by two witnesses only, which was admitted by the answer. And it was held by Lord Keeper Henley that the devise was void under the statute of mortmain. And in Edwards v. Pike, 1 Eden, 267, the same lord keeper held a devise to be void, it being proved to be upon a secret trust for a charity.

The doctrine of those cases was followed by Lord Chancellor Eldon in Stickland v. Aldridge, 9 Ves. 516. In that case there was an attempt to avoid the statute of mortmain (9 Geo. II. c. 36). Lord Eldon said:

"It would be a strong proposition that the providence of the legislature, having attempted expressly to prevent a disposition of land for purposes of this sort, was so short as to be baffled by such a transaction as is stated by this bill. The statute was never permitted to be a cover for fraud upon the private rights of individuals, and, though within the intention it cannot be said a trust is declared under these circumstances, it is clear a trust would be created upon the principle on which this court acts as to fraud. In the ordinary case of an estate suffered to descend, the owner being informed by the heir that, if the estate is permitted to descend, he will make a provision for the mother, wife, or other person, there is no doubt this court would compel the heir to discover whether he did make such promise. * * * It would be singular if the court would protect individuals, and would not act to prevent a fraud upon itself."

It was held in Gore v. Clarke, in the supreme court of South Carolina, reported 16 S. E. 614, that a devise intended to evade the provisions of a statute limiting the amount of property that can be given to a woman with whom testator had lived in adultery, or to his illegitimate children; although it is on the face of the will an absolute gift to a stranger, will not be upheld merely because the devisee had no notice during the testator's lifetime of the secret trust intended. A statute of South Carolina declares null and void any gift, devise, or any other devise whereby a person intends that more than one-quarter of his estate shall go to his illegitimate children. It will be noticed that in cases like Gore v. Clarke, Boson v. Statham, and Tee v. Ferris, supra, the thing that the testator attempted to accomplish by creating the secret trust was something prohibited by law; while that which Mr. Fayerweather sought to accomplish, namely, a gift of money to literary institutions, is not prohibited by law. And there is no public policy outside of the statutes (of 1848 and 1860) which condemns testamentary gifts to such institutions. Hollis v. Seminary, 95 N. Y. 166.

He could have given his estate or any portion thereof to the institutions named in the ninth paragraph of his will during his lifetime, and the gift would have been valid. He could have given it to them on his deathbed, as he gave the $100,000 in bonds to Mrs.

Beardsley, and the gift would have been valid. The only thing that the law prohibited him from doing was willing more than one-half of his estate to such institutions. But, if the testator had the right to give more than one-half of his estate to such institutions during his lifetime, he had a right to give it to a devisee upon the promise of the devisee that, after the testator's death, he, the devisee, would divide the estate in the manner the testator wished; for the courts have held that, but for the promise, the testator himself might have done what the devisee promised to do. Chamberlaine v. Chamberlaine, Reech v. Kennegal, Barrow v. Greenough, supra. "In these cases," said Kay, J., in Re Boyes (Boyes v. Carritt, 26 Ch. Div. 531), "the court has compelled discovery and performance of the promise, treating it as a trust binding the conscience of the donee, on the ground that otherwise fraud would be committed, because it is to be presumed that, if it had not been for such promise, the testator would have made  *  *  *  the gift." See, also, Williams v. Fitch and Dowd v. Tucker. That this trust is not a testamentary trust—that is, is not a trust created by will—was decided in Olliffe v. Wells, supra. It seems clear to me that, if this trust was not created by will, it does not come within the prohibition of the statutes of 1860, and that it is a valid trust, and should be carried out by the residuary legatees.

It is, however, contended by the defendant Bulkley that he made no promise to the testator, and did not in fact know of the secret trust until after the death of the testator, and that, therefore, as to him there was no trust. This contention cannot be maintained. O'Hara v. Dudley and Hooker v. Axford, supra. What was the trust on which the defendants Bulkley, Ritch, and Vaughan held the residuary estate? It was to carry out the intentions expressed in the will of Mr. Fayerweather. The only expression of the intention of the testator in regard to the residuary estate is contained in the tenth paragraph of his will, and is to the effect that all his residuary estate shall be divided among the several corporations mentioned in the ninth paragraph of his will, share and share alike. That intention never was changed; on the other hand, he reiterated it by the codicil of November 11, 1890. That intention the said defendants are in duty bound to carry out. I am of the opinion that the testator did not change his intentions in regard to the institutions mentioned in the ninth clause of his will by the memorandum of March 22, 1889. That memorandum mentioned three of the institutions, Hampton, Lincoln, and Cornell Universities named, and one, the Northwestern, not named, in the ninth clause. In it the testator says that, in his judgment, the bequests to Lincoln and Hampton Universities should be withheld, and the bequest of $200,000 to Cornell University should be reduced to $100,000. It is well settled that a testator cannot change his will by a paper not executed with all the formalities of the statute relating to wills. Addlington v. Cann, 3 Atk. 141; Johnson v. Ball, 5 De Gex & S. 85; Lomax v. Ripley, 3 Smale & G. 48; Tee v. Ferris, supra; Juniper v. Batchellor, 19 Law T. (N. S.) 200; In re King's Estate, 21 Ir. Law R. 273; Thomas v. Thomas (Ind. Sup.) 9 N. E. 457; Mann v. Mann, 14 Johns. 1; Tole

v. Hardy, 6 Cow. 333; Booth v. Baptist Church, 126 N. Y. 248, 28 N. E. 238, and cases there cited.

In Williams v. Freeman, 83 N. Y. 561, there was memorandum made by the testator. Judge Rapallo, in writing the opinion of the court, used this language:

"The memorandum forms no part of the will, and is not attested in such manner as to form a testamentary declaration. It is merely a parol declaration of the testator, * * * and comes under the head of extrinsic evidence. * * * The declarations of a testator can never be resorted to for the purpose of contradicting, or even explaining, the instructions expressed in the will."

The memorandum of March 22d, as far as it relates to the Northwestern University, in view of the pleadings and the action of the residuary legatees, acts as an extension of the trust upon which those legatees took the residuary estate. But, in any event, the Northwestern University is entitled to take, because the legatees mentioned in the ninth clause of the will, who are the only persons, in the view that I have taken of the law of this case, interested in its not taking, consent to its taking.

It is claimed by the defendants that the paper (Exhibit 10) executed by the institutions mentioned in the ninth paragraph of the will operated as a ratification of the deed of gift. I cannot give such effect to that paper. The only agreement on the part of those institutions contained in that paper is that the sum of $310,000 and certain expenses should be paid prior to the payment of the legacies to them; and, in the view I have taken of the law of the case, that payment was made from the fund that belonged to those institutions alone. None of the donees in the deed of gift were injured by the execution of Exhibit 10. Nor does the fact that the executors and trustees had a discretion under the ninth paragraph of the will change the aspect of affairs. That discretion was to be exercised only in case the conditions and circumstances of any of the said institutions should be so changed that it was not expedient to pay to such institution all or any portion of its legacy. That discretion was not an arbitrary one. It was to be exercised only if there were grounds for its exercise, and, there being no such ground shown in the evidence, the executors and trustees had no right to refuse to pay any legacy to any one of said institutions. Nor are the plaintiffs barred from maintaining this action by reason of the proceedings in the surrogate's court for the assessment of the inheritance tax. In re Ullmann, 137 N. Y. 403, 407, 33 N. E. 480.

The view that I have taken of the facts and the law of this case renders it unnecessary for me to consider the very interesting questions of law propounded by the learned counsel for the defendants Reynolds, Achter, and Fayerweather. I have said that the defendants Ritch, Bulkley, and Vaughan were trustees ex maleficio. I do not mean to be understood as saying that either one of said defendants committed any actual fraud against the testator. I have no doubt they did what they thought they had a right to do. There is nothing in the evidence showing that all of Mr. Ritch's acts in re-

gard to the testator were not free from fraud. I do not give effect to the deed of gift, because I am of the opinion, on the evidence, that Mr. Fayerweather did not change his intentions as expressed in his will and codicils and the private memoranda.

Judgment is ordered directing that the said residuary estate devised and bequeathed to the defendants Thomas G. Ritch, Justus L. Bulkley, and Henry B. Vaughan was received and is held by them in trust for the plaintiff herein and the several institutions named in the ninth paragraph of the will, and for the Northwestern University in the sum of $100,000; that said residuary estate now in their possession, except that part thereof necessary to provide for the payments mentioned in the third paragraph of the plaintiffs' prayer for relief, is now held by the said defendants in trust for the plaintiffs and the said several other institutions, upon the trust stated in the tenth paragraph of the will; that the said defendants be enjoined from distributing the residuary estate under the deed of gift; that they account for the moneys received by them under said last will and testament and codicils before Charles W. Dayton, who is hereby appointed referee to take and state their accounts; and that they have the costs of this action.